## STATE OF FLORIDA v BETTS
### Case No. 89-7409CF10A
Seventeenth Judicial Circuit, Broward County
July 11, 1989

### APPEARANCES OF COUNSEL
**Mindy Solomon,** Assistant State Attorney, for plaintiff.
**Johnny McCray,** for defendant.

### OPINION OF THE COURT
MEL GROSSMAN, Circuit Judge.

### *ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE*

THIS CAUSE was considered by the Court on the Defendant's Motion to Suppress Evidence in the form of a taped statement. A hearing on the motion was held in open court on June 22, 1989.

The narrow issue to resolve in the above captioned case is whether the Defendant, who was just a few days shy of her twelfth birthday, was able to understand the full ramifications of the waiving of her Fifth Amendment rights so as to effectuate a knowing and intelligent waiver of same.

The testimony revealed that on March 14, 1989, the Defendant's 15 month-old brother was found dead in their house and her two-year-old sister was found unconscious but alive. At this time, the police suspected that the victims had ingested some type of poison. Concerned for the Defendant's health, Detective Lewis of the Wilton Manors Police Department picked the Defendant up at school and told her that he was taking her to the hospital for tests, which ultimately proved negative. She was also placed in protective custody in an H.R.S. facility.

Meanwhile, the police had interviewed the Defendant's aunt who at first stated that she had baby-sat for the children. However, the aunt later recanted her statement and at that time the investigation focused on the Defendant as the prime suspect. On March 16, 1989, Detective Lewis, whom the Defendant had come to regard as a friend, picked A.B. up from an H.R.S. foster home. Detective Lewis told the Defendant that the police were continuing their investigation, but he did not tell her that she was the prime suspect. Detective Lewis testified that during the drive she appeared nervous, depressed and "sad-looking." Detective Lewis tried to cheer A.B. up by telling her jokes.

When Detective Lewis and A.B. arrived at the offices of the Broward Sheriff, A.B. was lead into an interrogation room. Present were Sally Butterfield (A.B.'s mother), Detective Lewis, Detective Jones, Detective Carney and Detective Wiley. Detective Lewis introduced A.B. to the other detectives and then he and Detective Jones left the room. Detective Carney proceeded to read A.B. her rights as printed on a juvenile rights waiver form. He read the questions one by one and asked A.B. and her mother to sign where provided. During this procedure Detective Lewis asked A.B., "Do you know what a lawyer is?." She replied, "Yes." When he asked her "Do you know what a lawyer does?," she replied, "He helps you in court."

It is the defense's contention that this colloquy shows that A.B. did not understand that she could have an attorney with her at the time she spoke with the officers. The State, on the other hand, contends that the signing and initialing of the rights form along with A.B.'s affirmative responses demonstrate her understanding and the voluntariness of her waiver of rights.

There is, however, a problem with relying solely upon A.B.'s literal answers to the form's questions. That problem is clearly illustrated by the following: A.B. answered "Yes" to the question of whether she wanted her parent or legal guardian present during questioning. Yet, it is undisputed that the Defendant strongly indicated that she did not

194

want her mother in the room. (The mother also indicated that she did not want to be in the room.) Moreover, while A.B. was given the rights form to read, the evidence did not affirmatively indicate that she actually read that form save for the top two lines.

After her mother left the room, the Defendant gave an unsworn statement implicating herself. The detectives then sought to take a second and recorded statement. Ms. Butterfield was informed of the essence of A.B.'s unsworn statement and was asked several times to be present during the record of that second statement. She adamantly refused. Before the recording, the Defendant was not again advised of her rights; however, at the beginning of the taping, Detective Carney referred to the rights form. The Defendant then proceeded to make inculpatory statements that amounted to a confession.

The Court finds, based on the evidence presented, that the Defendant did not fully understand the effect of not having an attorney when she made the inculpatory statements; nor did she understand the consequences of her statements. In this regard, the Court finds the testimony of Dr. Glenn Caddy, a clinical psychologist appearing as a defense witness, to be extremely credible.

Especially relevant in his opinion that the Defendant was so starved for attention and affection that if anyone showed her the slightest kindness she would cling to and fully trust that person. That is exactly the situation here. The emotional condition of the Defendant was such that it clouded her ability to knowingly and intelligently waive her rights, thus affecting the voluntariness of the waiver. *Rickard v State*, 508 So.2d 736 (2d DCA 1987). At the time that the taped statements were made, the Defendant viewed the police as friends trying to help her. Unbeknowest to her, however, they viewed her at that time as the prime suspect.

Dr. Caddy's opinion is reinforced by the Defendant's behavior in the courtroom. The Court notes the following actions of the Defendant during the hearing which indicate extreme immaturity: she continually sucked her thumb, twirled her hair, and kept her head down covered by a man's suit jacket. These actions are not ones that are usually manifested by a normal twelve year old. They are, indeed, an indication of the emotional retardation present in the Defendant.

In discussing cybernetics, Norbert Weiner spoke of actions being the result of the interplay of external stimulate and store secondary symbols. While not a revolutionary observation, it is one which is helpful in analyzing the facts presented in this case, and is important in view of Dr. Caddy's additional testimony. Dr. Caddy also testified that

there were serious limits to the Defendant's understanding based not so much upon ability as upon her knowledge and experience.

In this case, the Court finds that the Defendant reacted not to the contents of the warning but to the interest and concern shown by the police officers. That interest and concern was the operative stimulus. This child, whose mother showed no positive interest in her even at this critical time, embraced the officer's interest and concern and reacted to that in an effort to please them. The Court finds that she did so with no understanding imparted to her by her background, her mother, or what was said to her at the time, of the consequences of her actions.

To prove a knowing and intelligent waiver of a juvenile's right to counsel and right to remain silent, the state bears a heavy burden. *See, e.g., T.B. v State,* 306 So.2d 183 (2d DCA 1975). In this case it has failed to successfuly do so. The Court finds that the Defendant, when waiving her rights, did not do so knowingly and intelligently. *Fare v Michael C.,* 442 U.S. 707, *reh'g denied,* 444 U.S. 887 (1979); *T.B. v State, infra.*

BASED ON the foregoing findings and conclusions it is hereby ORDERED AND ADJUDGED that the Defendant's Motion to Suppress the taped statement in this case is granted.

DONE AND ORDERED this 11th day of July, 1989.